# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 21-0530V

|  |  |
|---|---|
| VIVIEN CORD,<br><br>     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>     Respondent. | Chief Special Master Corcoran<br><br>Filed: November 1, 2024 |

*Bridget Candace McCullough*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Alexa Roggenkamp*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On January 11, 2021, Vivien Cord filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza vaccination she received on August 19, 2020. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although entitlement was conceded in Petitioner's favor, the parties could not agree to a damages figure.

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of $115,000.00 for actual pain and suffering (the sole compensation element at issue)**.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

I.      **Relevant Procedural History**

Even though the matter was conceded, the parties reached an impasse in their discussions regarding damages. ECF No. 42. Petitioner therefore filed a Brief in Support of Damages ("Br.") on February 7, 2024. ECF No. 45. Respondent filed a responsive brief ("Resp.") on March 25, 2024. ECF No. 46. I subsequently proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed damages issues. ECF. No. 49. That hearing was held on October 25, 2024,[3] and the case is now ripe for a written determination.

II.     **Relevant Medical History**

Petitioner was 79-years old when she received a flu vaccine in her left arm at a CVS pharmacy in New York on August 19, 2020. Ex. 3 at 3. Eight days later, she visited a physician's assistant at her orthopedic surgeon's office and reported "intense" left shoulder pain that began about half a day after her flu shot. Ex. 6 at 491. On exam, Petitioner had tenderness, reduced strength and severely limited range of motion. *Id*. at 492. She received a cortisone injection. I*d*.

Petitioner returned to her orthopedic provider on September 11, 2020, to follow up on her left shoulder pain. Ex. 6 at 493. She now stated that the cortisone injection had provided relief for a couple of days, then the pain returned and seemed to be getting worse. *Id*. She reported difficulty sleeping. *Id.* At that time, the provider noted that Petitioner could not take NSAIDs due to potential interaction with her other medications. *Id*. He offered physical therapy, which Petitioner declined because she did not believe it could work. *Id*. She was advised to use heating pads and/or ice compresses. *Id*.

An MRI on October 3, 2020 revealed (1) marked supraspinatus tendinosis with a small full-thickness tear; (2) partial thickness tear of the infraspinatus; (3) moderate joint effusion with diffuse synovitis; (4) moderate biceps tendinopathy; (5) moderate AC arthrosis; and (6) a SLAP tear. Ex. 6 at 496.

Petitioner saw an orthopedic surgeon at the same practice on October 14, 2020. Ex. 6 at 497. She reported "quite severe" pain in her left shoulder about half a day after a flu injection in August and only three days of relief from the previous cortisone injection. *Id*. On exam, she had significant pain and guarding during testing. *Id*. at 498. The doctor believed the symptoms could have been precipitated by the vaccine, but he stated that

---

[3] At the end of the hearing held on October 25, 2024, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

2

he had never heard of a vaccine causing a rotator cuff tear. *Id.* He recommended arthroscopic surgery. *Id.*

On October 19, 2020, Petitioner sought a second opinion with another orthopedic surgeon. Ex. 6 at 500. She reported "significant pain" in her left shoulder since her flu vaccination at CVS. *Id.* On exam, she had significantly reduced ROM, positive impingement testing, and diffuse tenderness to palpation. *Id*. at 502. The doctor noted a pseudosubluxation on her x-rays and recommended a course of physical therapy. *Id.* He noted that if she did not respond to therapy, surgical intervention may be necessary. *Id*.

The following day, Petitioner had a physical therapy evaluation. Ex. 7 at 11. She reported left shoulder pain since the day after her vaccination, with 9/10 pain at its worst. *Id*. Petitioner's examination revealed severely reduced range of motion and the "chronic, inflammatory, and severe" pain. *Id*. Treatment was planned twice a week for four to six weeks. *Id*. at 12. Petitioner did not have continue physical therapy at that time.

On October 28, 2020, Petitioner sought a third opinion from another orthopedic surgeon. Ex. 4 at 5. She reported significant pain and loss of function since her flu shot on August 19, 2020. *Id.* She had difficulty raising her arm above 90 degrees and difficulty dressing and bathing. *Id*. The doctor opined that her MRI findings were not uncommon for her age. *Id*. He felt it was reasonable to treat non-operatively with physical therapy because rotator cuff repairs in patients her age have a high rate of failure. *Id*.

Petitioner next sought evaluation from a fourth orthopedic surgeon on October 30, 2020. Ex. 5 at 17. She reported worsening left shoulder pain and decreased mobility since her immunization in August 2020. *Id*. The doctor reviewed Petitioner's imaging and noted "marked inflammatory changes" around the bursa, indicating possible infection. *Id*. at 20. He recommended blood work. *Id*. She returned to this surgeon on November 11, 2020. *Id.* at 13. Based on her blood work, he had heightened concern for septic arthritis or septic bursitis. *Id*. at 15. He recommended arthroscopic surgery to take synovial biopsies and referred her to an infectious disease specialist. *Id*. at 15-16.

On November 20, 2020, Petitioner saw an infectious disease specialist. Ex. 6 at 519. Although he agreed to do arthrocentesis to obtain fluid from the shoulder to test, he thought that after three months and no fever or other infectious signs, an inflammatory process was more likely than an infectious process. *Id*. at 521.

Petitioner's exam was unchanged when she returned to the orthopedist on December 2, 2020. Ex. 5 at 9. He recommended that Petitioner find a new infectious disease doctor (as she did not like the first one) and recommended IV antibiotics until infection was ruled out. *Id.* at 12.

On December 8, 2020, Petitioner saw a rheumatologist. Ex. 8 at 7. She reported pain in the shoulder, eye pain, and dryness in her eyes and mouth, and left ankle pain and swelling beginning November 29, 2020. *Id.* The doctor found that her exam was "not consistent with a raging septic arthritis," but agreed that testing the synovial fluid was appropriate. *Id*. at 9.

On December 9, 2020, Petitioner saw a second infectious disease specialist. Ex. 8 at 12. His assessment was arthritis. *Id*. at 15. He noted that there was not yet proof of infection – and her range of motion, pain levels, lack of fever were not consistent with a typical septic joint. *Id*.

Petitioner underwent arthroscopic surgery on December 10, 2020. Ex. 9 at 61-62. Surgery included extensive debridement of the glenohumeral joint with capsular release and synovectomy and subacromial decompression. *Id*. at 61. Her post-operative diagnoses were inflammatory synovitis and bursitis, possible sepsis, and possible autoimmune inflammatory disease. *Id.* The operative notes indicate "cloudy yellow synovial fluid," "raging synovitis," grade 3 degenerative change of the glenohumeral joint, and degenerative tearing of the labrum. *Id.*

On December 18, 2020, Petitioner underwent a post-operative exam. Ex. 5 at 5. The cultures obtained during surgery were negative and the "pathology report read as rheumatoid." *Id*. at 7. Her left shoulder condition was deemed an autoimmune inflammatory arthropathy, with "no significant structural damage," and she was referred her to a rheumatologist and for physical therapy. *Id*.

Petitioner returned to physical therapy on December 23, 2020. Ex. 7 at 16. Her pain level was 3/10 and she reported her worst pain as 8/10. *Id.* Treatment was planned twice a week for 6-8 weeks. Id. at 17. Petitioner attended only one additional treatment on December 28, 2020. *Id*. at 18.

Petitioner again saw a rheumatologist on January 11, 2021. Ex. 8 at 18. She reported continued "diffuse joint pain," and no change in her left shoulder. *Id*. Petitioner's repeat bloodwork was negative for autoimmune disease. *Id*. at 21. At a cardiologist appointment on January 19, 2021, Petitioner reported that her left shoulder range of motion and pain had improved by 40%. Ex. 10 at 9.

The record of Petitioner's wellness visit on March 9, 2021, states that she was "status post SIRVA of left shoulder from flu shot about a year ago." Ex. 10 at 26. She reported right shoulder pain, discomfort, and weakness that began immediately after her

4

second covid-19 vaccination on February 11, 2021. *Id*. was referred to an orthopedist. *Id*. at 27.

Petitioner returned to her rheumatologist on March 15, 2021. Ex. 8 at 23. She reported pain in both wrists, knees, elbows, and left shoulder. *Id*. On exam, she had tenderness in her left shoulder, but "good ROM." *Id*. at 26. The doctor ordered further x-rays (knees and hands) and bloodwork due to her morning stiffness and polyarthralgia. *Id*. The testing was ultimately negative for inflammatory rheumatologic disease. *Id*. at 33.

No further records of treatment for Petitioner's shoulder pain were filed.

### III.     The Parties' Arguments

Petitioner seeks an award of $130,000.00 for her pain and suffering. Br. at 1. She argues that her SIRVA injury was "moderately severe," with immediate severe pain, "a complete inability to lift her arm," and required surgical intervention. *Id.* at 10. She highlights that her impairments were significant and her treatment extensive (if relatively short in duration). *Id*. Finally, Petitioner note that after her surgery she reported only 40% improvement in symptoms and continues to experience "residual pain" in her shoulder. *Id*.

During the hearing and in her brief, Petitioner discussed prior SIRVA cases that involved injured claimants with awards ranging from $100,000 to $130,000 and argued that an award of $130,000.00 in pain and suffering was reasonable and appropriate in comparison. Mot. at 7-10.

### a.  Respondent

Respondent argues that Petitioner's request for $130,000 in pain and suffering is "excessive." Resp. at 2. He notes that her case "represents a unique circumstance where a moderate-to-severe award is warranted, even though Petitioner received surgery on her shoulder." *Id*. at 13. Specifically, Respondent argues that Petitioner "did not choose to pursue conservative treatment" prior to her surgery and that the duration of her symptoms was "only slightly over six months." *Id*. at 13-14.

Respondent also distinguishes Petitioner's cited prior SIRVA cases, noting that all of them had longer treatment courses and more treatment (including conservative measures) in addition to surgery. Resp. at 15-16. Respondent discussed eleven prior SIRVA cases during the hearing, which taken together suggested an appropriate range of award between $65,000 and $97,500. *Id*. at 11-13.

5

**IV.     Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior pain and suffering awards to aid in determining the appropriate amount of compensation for pain and suffering in a case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

### V.     Prior SIRVA Compensation Within SPU[5]

#### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2024, 4,138 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,016), with the remaining 122 cases dismissed.

2,308 of the compensated SPU SIRVA cases were the result of a reasoned ruling that the petitioner was entitled to compensation (as opposed to an informal settlement or concession).[6] In only 235 of these cases, however, was the amount of damages *also* determined by a special master in a reasoned decision.[7] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] The remaining 1,708 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[7] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,044 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

(the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[8]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[9] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *235* | *2,044* | *29* | *1,708* |
| **Lowest** | $35,000.00 | $10,000.00 | $45,000.00 | $2,500.00 |
| **1st Quartile** | $67,910.00 | $60,539.19 | $90,000.00 | $35,000.00 |
| **Median** | **$85,920.03** | **$80,240.98** | **$130,000.00** | **$50,000.00** |
| **3rd Quartile** | $125,066.35 | $109,681.54 | $162,500.00 | $77,500.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.   Pain and Suffering Awards in Reasoned Decisions

In the 235 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $35,000.00 to $215,000.00, with $85,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[10] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[11]

---

[8] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[9] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[10] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[11] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In eight cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### VI.  Appropriate Compensation for Petitioner's Pain and Suffering

When performing this analysis, I review the entire record, including all filed medical records and affidavits and all assertions made by the parties in written documents and during oral argument. I also consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

In this case, there is no dispute of the Petitioner's pain awareness, and the parties generally agree on what course of treatment Petitioner experienced for her SIRVA. Petitioner sought treatment for severe pain and range of motion deficits only eight days after her vaccination. Ex.6 at 491. She received one cortisone injection that provided little relief. *Id.* at 491, 493. She continued to treat her SIRVA symptoms consistently, seeking additional opinions from specialists, prior to having arthroscopic surgery 3.5 months after her vaccination. *See e.g.,* Ex. 6 at 497, 500, 519; Ex. 8 at 7; Ex. 9 at 61-62. She attended a total of three physical therapy sessions – one prior to and two after surgery. Ex. 7 at 11-

12, 16-18. There are documented symptoms of just over six months, although Petitioner alleged she continues to experience residual pain in her shoulder (which is not uncommon). Ex. 2 at ¶13. Overall, her course of treatment suggests a serious SIRVA injury of relatively short duration.

Petitioner argues that her SIRVA was "moderately severe" with immediate severe pain and range of motion limitations that required "extensive" treatment including surgery. Br. at 10. Respondent, by contrast, highlights that Petitioner "did not choose to pursue conservative treatment" and had "some potential overlapping pathologies that likely contributed to her shoulder pain." Resp. at 13-14. He further argues that Petitioner's failure to seek conservative care, specifically physical therapy, prior to undergoing surgery is the kind of "unique circumstance" where a petitioner undergoing surgery should received a lower award of pain and suffering.

To support his argument, Respondent relies primarily on *Shelton v. Secretary of Health and Human Services,* No. 19-0279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021) and *Hunt v. Secretary of Health and Human Services*, No. 19-1003V, 2022 WL 2826662f (Fed. Cl. Spec. Mstr. June 16, 2022),[12] in which I awarded $97,500 and $95,000 in pain. Resp. at 13. But I have consistently deemed these decisions outliers for the purpose of calculating pain and suffering. In *Shelton*, I found that a lower award was warranted due to that petitioner's lengthy delays in seeking treatment for her SIRVA, indicating a less severe injury. *Shelton*, 2021 WL 2550093 at *7. In *Hunt*, the petitioner experienced periods of little-to-no pain throughout her treatment. *Hunt*, 2022 WL 2826662 at *8-10. Neither of these conditions are present in this case. Ms. Cord sought treatment within 8 days of her vaccination, treated consistently, and did not report any significant relief of pain until after her surgery.

I also do not find that Petitioner's choice to forego physical therapy constitutes the kind of unique circumstance that justifies a lower pain and suffering award as in *Shelton* or *Hunt*. Although it is true that Petitioner sought alternative opinions from four orthopedic surgeons, only two of them recommended physical therapy,[13] and one of those indicated that if it was not helpful, surgery may be necessary. *See* Ex. 4 at 5; Ex. 6 at 502. The other two surgeons recommended proceeding directly to surgery, with one of them recommending urgent surgery due to his suspicion of an infection. *See* Ex. 5 at 15-16; Ex. 6 at 497. There is no evidence in the record suggesting that Petitioner could or would have avoided surgery if she has first tried physical therapy or other conservative

---

[12] Respondent cited nine other cases with awards ranging from $65,000 to $85,000 in his brief, however, none of those cases involved petitioners who had surgical intervention and thus, are less helpful to my analysis here.

[13] An orthopedic physician's assistant also recommended physical therapy, however, that recommendation was made prior to Petitioner's MRI which revealed significant pathology. *See* Ex. 4 at 491; Ex. 6 at 496.

10

treatment. Further, there is no requirement in the Vaccine Program for petitioners to pursue any particular treatment or treatments in any recommended order. However, Petitioner's treatment course, including the number of physical therapy treatments she had, remains relevant to the damages determination and is useful in comparing to similarly situated petitioners in prior SIRVA cases. The fact that Petitioner did not require more physical therapy after her surgery to recover is an objective indicator of her pain and suffering.

At the same time, and although the cases cited by Petitioner are better comparables, they too are not completely on all fours with this case. In each, the relevant petitioner had longer durations of symptoms, plus more physical therapy and other treatments than did Ms. Cord.

I find Petitioner's situation to be most similar to the Petitioner in *Weed v. Sec'y of Health & Human Servs.*, No. 19-1684V, 2021 WL 1711800 (Fed. Cl. Spec. Mstr. Mar. 30, 2021) in which I awarded $105,000.00 in pain and suffering. The *Weed* petitioner sought treatment one week after vaccination, reported severe pain, and had surgery within two months. *Id*. at *3-4. She had nine physical therapy treatments after her surgery (and none before), made a strong recovery that allowed her to return to gardening and swimming, and concluded her treatment in six months. *Id*. While Ms. Cord had fewer physical therapy treatments, she experienced more severely limited range of motion, required additional testing from infectious disease and rheumatology specialists to rule out other conditions, and did not experience a complete recovery, reporting only 40% improvement near the end of her treatment which supports a slightly higher award.

Overall, considering the arguments presented by both parties at the hearing, a review of the cited cases, and based on the record as a whole, I find that **$115,000.00** in compensation for past pain and suffering (slightly higher than the award in *Weed*) is reasonable and appropriate in this case.

## Conclusion

In light of all of the above, the I award **Petitioner a lump sum payment of $115,000.00, for her pain and suffering in the form of a check payable to Petitioner, Vivien Cord.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[14]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.